**STATE OF VERMONT**

**ENVIRONMENTAL COURT**

| | |
|---|---|
| Appeals of Garen | } |
| | } |
| | }     Docket Nos. 42-3-01 Vtec and |
| | }     218-9-00 Vtec |
| | } |
| | } |

Decision and Order

Appellants David and June Garen appealed from two decisions of the Development Review Board (DRB) of the City of Burlington granting preliminary plat approval (Docket No. 218-9-00 Vtec) and final plat approval (Docket No. 42-3-01 Vtec) to Appellee-Applicants Green Mountain Habitat for Humanity, Inc. and Burlington Housing Authority (BHA) for an eight-unit planned residential development. The two appeals were consolidated, and Appellants recognized that the preliminary plat appeal was essentially moot and that the matter was to proceed as an appeal of the final plat approval. The original appellants withdrew and, after appeal to the Supreme Court, the Intervenors Katherine W. Desautels (formerly Gluck) and John Desautels were allowed to continue with the appeal, but only on the issues timely raised by the original appellants. By agreement of the parties, the matter has remained with the original caption.

Appellee-Applicants are represented by Neil H. Mickenberg, Esq.; the City is represented by Kimberlee J. Sturtevant, Esq.; Intervenors Katherine W. Desautels and John E. Desautels are represented by Michael J. Straub, Esq. By entry order dated September 10, 2002, the Court changed the party status of two other individuals (Lorraine Gorton and Jeffrey Landa) who had originally entered their appearance as interested persons but who had not appeared at pretrial conferences nor otherwise participated, so that they would receive notices for their information but would not be expected otherwise to participate.

The Court issued an order disposing of certain issues in the appeal and addressing the scope of the appeal on November 7, 2002. An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge. The parties were given the opportunity to submit written requests for findings and memoranda of law. Upon consideration of the evidence and the written memoranda and proposed findings, the Court finds and concludes as follows.

Appellee-Applicants propose to construct an eight-unit planned residential development (PRD), consisting of four single-family houses and two side-by-side duplex houses, to be operated as a condominium. The residential portion of the project is to be constructed on a portion of a parcel of land owned by BHA in the City=s residential low density zoning district. A PRD is a permitted use in this zoning district. The plans for the proposed PRD were admitted in evidence and Appellee-Applicants propose to incorporate the conditions imposed by the DRB within their application as made to the Court in this proceeding.

BHA owns a 16.2-acre parcel of land[1], with frontage on North Avenue and Venus Avenue. Of this 16.2-acre parcel, the westerly 6.4 acres has been developed for a housing project called Franklin Square, which has access by a loop roadway from North Avenue. Of that 6.4 acres, 2.5 acres has been or is proposed to be deeded to the City as the right-of-way underlying the Franklin Square roadway, with BHA retaining ownership of the rest of the parcel. Directly to the east of the Franklin Square project lands is a .9-acre sub-parcel of land, labeled as A Lot 1B@ on the property plat, that is undeveloped but is not proposed to be developed or managed in connection with the Venus Avenue proposal now before the Court. That .9-acre sub-parcel, together with the

6.4-acres comprising the existing Franklin Square development, have not been presented as part of the proposal before the Court and will not be further discussed.

To the east of the Franklin Square development, between it and the sub-parcel proposed for the construction of the residences, is a 6.6-acre undeveloped sub-parcel, labeled as ALot 1E@ on the property plat, to be subject to a conservation easement. Although it is owned by BHA, it has been used over time by the public, without any management or supervision, including uses for play, for the construction of tree houses, for walking, for birdwatching, and for dumping yard waste and other waste. This decision will refer to this sub-parcel as the A 6.6-acre easement parcel.@

To the east of undeveloped sub-parcel A1E@ is a 2.3-acre sub-parcel with frontage on Venus Avenue, labeled as A Lot 2@ on the property plat. The southernmost segment of ALot 2@ is shown as a 0.6-acre undeveloped sub-parcel, also to be subject to a conservation easement. This decision will refer to this sub-parcel as the A 0.6-acre easement parcel.@ The two easement parcels are proposed to be subject to a conservation easement to be deeded to the City= s Department of Parks and Recreation and the Vermont Housing and Conservation Board, protecting them from development and ensuring managed public access under a management plan.

The remainder of A Lot 2@ consists of 1.2 acres on which the six residential buildings are proposed to be constructed, and 0.5 acres of land lying under the proposed road right-of-way to serve the development, which roadway is proposed to be deeded to the City. This decision will refer to these 1.7 acres as the Adevelopment parcel[2].@ The development parcel is relatively flat and wooded.

To the south of the 16.2-acre parcel discussed above, lie two other parcels of land which are proposed to be managed as a condition of and in connection with the proposal before the Court. The easternmost of these, adjacent and to the south of ALot 2@ and of a portion of ALot 1E,@ is an undeveloped 3-acre parcel of land also owned by the Burlington Housing Authority. This decision will refer to this parcel as the A 3-acre southern BHA parcel.@ To the west of this parcel, also adjacent and to the south of a portion of ALot 1E,@ is an undeveloped 1.84-acre[3] parcel already owned by the City= s Department of Parks and Recreation. The 3-acre southern BHA parcel is proposed to be deeded outright by BHA to the City= s Department of Parks and Recreation. It, together with the adjacent 1.84-acre parcel already owned by the Department of Parks and Recreation, and together with the two easement parcels described above, will remain undeveloped and will be cleaned up and managed by the Department of Parks and Recreation under a Management Plan. The Management Plan is subject to an independent public comment and adoption process not before the Court in this proceeding; it will allow for public access and recreational use, and monitoring by City employees, consistent with the natural characteristics and constraints of the land.

The 6.6-acre easement parcel contains a Class II mapped wetland, which also extends onto the 1.84-acre parcel already owned by the Department of Parks and Recreation and the 3-acre southern BHA parcel, which are proposed to be preserved in connection with the proposal before the Court. On the 6.6-acre easement parcel, the boundaries of that wetland and its 50-foot buffer zone have been delineated[4] on the project plans in evidence. The boundary cuts across the northeast corner of the 6.6-acre easement parcel, but does not extend onto either the development parcel or the 0.6-acre easement parcel. The soils in the wetland are unusual in that they are sandy, because sandy soils drain easily. The fact that in this case they support a wetland, but well above the elevation of the Winooski River or Lake Champlain, suggests that an impervious layer is located below the saturated zone as is shown on the groundwater hydrology sheet of the project plans (Exhibit 8). The direction of groundwater flow is generally to the north-northeast, from the area of the wetland towards and through the development parcel, also as shown on the groundwater hydrology sheet of the project plans (Exhibit 8). Because of the

direction of groundwater flow, if groundwater were to become contaminated in the development parcel, it would not affect the groundwater upgradient in the easement parcels or the other parcels subject to the Management Plan.

The Class II wetland is locally known as the Mt. Calvary Red Maple Swamp. It qualifies not only as a wetland but as a rare natural area, both because it contains some rare plants and because it is a red maple/black gum swamp with wetland plant species and wetland hydrology, but located on sandy soils. That is, it is rare because this plant community is rarely found in association with these sandy soils, and because black gum is unusual in Vermont.

The development parcel consists of 1.7-acres of upland. Its trees of over 10" in diameter, as seen on Exhibit 33, are predominantly maple and birch trees, with a scattering of aspen and poplar, and only a few large oak and pine trees. In the past, before the residential neighborhoods to its north and east were developed, it may once have been part of a pine/oak/heath sand plain community, but it does not represent such a community now and does not qualify for protection on that basis under the Burlington ordinances. Any remnants of pine/oak/heath sand plain community existing in hummocks within the wetland or otherwise located within the conservation areas or the two southerly parcels will be preserved by this proposal.

The neighborhood of the project is characterized by predominantly single-family homes on modest lots; with some duplex buildings or private homes converted to multi-apartment use, scattered throughout the neighborhood. Developments in which larger numbers of townhomes or duplexes predominate, such as the Franklin Square development, are located farther away following the City=s street system, although they are in the wider neighborhood.

Venus Avenue is a city street that has a paved width of 30 feet. It now ends at the project boundary, shortly after its intersection with Meridian Street. Intervenors= home fronts on the eastern side of this short dead-end segment of Venus Avenue; this area has been used informally for years as a neighborhood play area, but is not developed as or denominated a municipal park or playground.

The development parcel is wooded, and contains trees of over 10" in diameter; approximately 85 trees are proposed to be removed for the project. The trees to be removed include one very large (36"-diameter) oak tree right on the project boundary and within the proposed extension of Venus Avenue into the project. Because of its location in the roadway at the boundary, there is no way that any residential use could be made of that parcel without removing that particular tree. On the development parcel all the trees except those required to be removed within the house sites or the roadway or for the construction envelope of the buildings are proposed to be retained. Additional street trees and trees and shrubs are proposed to be planted as shown on the landscaping plan. All the trees and vegetation in the two easement areas are proposed to be undisturbed, including all the trees and vegetation within the rare natural area of the Mt. Calvary Red Maple Swamp. The erosion control plans governing the site during construction are adequate to avoid soil erosion and to protect the existing vegetation to be preserved.

The project proposes four single-family homes and two duplexes, designed facing an extension of Venus Avenue onto the property and ending in a cul-de-sac. Two of the single-family homes are located nearest to the adjoining homes in the adjacent neighborhood; the other two single-family homes are located on the turnaround. The scale, design and placement of the buildings in relation to the street echoes the size, scale and design of the homes in the nearby neighborhood. The buildings have pitched roofs and clapboard-appearance siding consistent with modest residential construction in the neighborhood. The proposed lighting, carports, and trees and shrubs to be added for street trees and landscaping is consistent with the appearance and style of the nearby residential neighborhoods.

The project site is designed to drain towards the roadway, which is designed with underdrains to drain to the city stormwater drainage system. There is sufficient capacity in the stormwater drainage system to handle the drainage from this project, so that the drainage from the project will not adversely affect any adjacent properties. The buildings were originally proposed without basements. However, now it appears from the project plans that at least the single family homes, if not the duplexes, are proposed to have basements, with a foundation drain system to drain into the drainage system for the project and into the city stormwater system. See Sheet R-3 of Exhibit 8, as compared with Sheets D1 and D2 of Exhibit 8; and see footing drain detail on Sheet 5 of Exhibit 8. The A basement area@ is drawn on Sheet R-3 as a dashed line, which extends below the finished floor elevation approximately 9 feet by scale. The footing drain detail shows the footing drain extending into a drainage stone sub-base installed as much as 8 feet below the finished grade, below the A basement slab.@ The footing or foundation drains are shown as engineered on the project plans, but the basements are not shown as engineered on the building elevations, but only as a suggested dashed line. The buildings are proposed to be served by municipal water and sewer services.

The groundwater hydrology plan, sheet 6 of the project plans in Exhibit 8, shows the groundwater level on the site at the roadway to be only 22 feet below the surface of the ground, and shows a A barrier stratum@ or impervious layer that is located 8 feet below the surface. The information on which that diagram is based came from the four monitoring wells installed on the development parcel and the 0.6-acre easement parcel. The underdrains for the road are proposed to extend 5 feet below the surface (that is, 3 feet above the impervious layer), and to have a drawdown curve or zone of influence that extends only 122 feet out from the underdrains (see Exhibit 14 and diagram and calculation on sheet 6). The underdrains for the road therefore will not draw down or influence the groundwater level flowing out of the wetland, which is more than 200 feet upgradient of and away from the underdrains.

However, the foundation drains for the basements could potentially have a greater effect on the groundwater than the underdrains for the roadways, both because they appear from the project plans and details to be much deeper, and because that effect has not been calculated[5] in the project proposal or in testimony during trial. Moreover, there is no indication whether the A barrier stratum@ shown in the footing drain detail would be permitted to be breached during construction, in order to install a deep enough basement, footings, or underdrain. A breach in the barrier stratum could have a much more significant effect on the groundwater regime in the area, on which the existence and preservation of the red maple/black gum wetland depends, than the underdrain for the roadway which is located well above that barrier stratum. If the project is to be approved, any approval will have to be conditioned on Appellee-Applicants= eliminating the basements from the building design, so that any footing drains below the slabs extend no farther below the surface than do the underdrains proposed for the roadway. In the alternative, in lieu of eliminating the building basements, Appellee-Applicants of course would be free to apply to the City for an amendment to this approved project, with supporting engineering and hydrology detail regarding the radius of influence of the footing drains and regarding the relationship of the basements to the barrier stratum, for approval of the design and installation of any building basements.

We address the issues as restated in the Court= s November 7, 2002 order. All references to a sections in the following format: e.g. A ' 11.1.1(c)@ refer to the Zoning Ordinance, while all references to sections in the following format: e.g. A ' 28-7(a)(2)@ refer to the Subdivision Ordinance.

Open Space, Scenic Beauty, and Landscape Preservation Requirements

The following questions are grouped under this heading: Does the project preserve the natural and scenic qualities of open space? [' 11.1.1(c)]; Does the project preserve the landscape as required by ' 6.1.10(b)?; Does the project provide for open space as required by ' 6.1.10(c)? Will

the project have an undue adverse effect on the scenic or natural beauty of the area, or on aesthetics. [' 28-7(a)(1)(G)] Does the project plan as a whole preserve as many existing trees as possible? [' 28-7(a)(1)(G)]

The project as proposed meets this group of requirements. Of the almost 12 acres of BHA= s property comprising both easement parcels, the development parcel, and BHA= s southerly parcel, all but 1.7 acres is being placed under protection and management to be cleaned up and managed as open space, preserving its natural and scenic qualities. The six buildings proposed for the development parcel are consistent with the appearance of the nearby neighborhoods and will not have an undue adverse effect on the scenic or natural beauty of the area. The project plan preserves as many existing trees as possible, including all the trees on the 10.3 acres being preserved, and as many trees as possible on the development parcel.

Park and Recreation Requirements

The following questions are grouped under this heading: Does the project eliminate a play area at the end of Venus Avenue and 1.84 acres of recreation space in the open space, and, if so, should the project include a plan for replacing either or both of these areas.[' 28-7(a)(1)(K)]; and therefore will the project have an undue adverse effect on the present and projected park and recreation needs of the City? [' 28-7(a)(1)(K)].

The project as proposed meets this requirement. While it may eliminate a de facto play area at the end of Venus Avenue, that play area is itself within the right-of-way of a city street, which was extended to the neighboring undeveloped property under the City= s regulations to allow for future development such as the present proposal. That area is not part of the project proposal, will not be taken by the project proposal, and need not be replaced by the project proposal. In addition, rather than eliminating any recreation space in the development parcel, the project will actually dedicate and preserve for public recreational use some 10.3 acres of land formerly privately held by BHA on which public access could have been prevented.

Design Quality and Neighborhood Pattern Requirements

The following questions are grouped under this heading: Does the project achieve a high level of design quality and amenities? [' 11.1.1(f)] Does the project relate buildings to the environment as required by ' 6.1.10(a)? Does the project protect Burlington= s heritage as required by ' 6.1.10(*i*)? Does the project consider the microclimate as required by ' 6.1.10(j)?

Is the siting of two duplex units in direct conflict with the pattern of single-family residences along Venus Avenue and Meridian Street. [' 28-7(a)(1)(G)]. Does the inclusion of duplex buildings destroys rather than conserves the single-family nature of existing neighborhoods, contrary to the City= s municipal development plan? [' 28-7(a)(1)(*l*)].

The project as proposed meets these requirements. The four single family and two duplex buildings blend well with the existing pattern or rhythm of development. Both the single-family and the duplex buildings are consistent with and in harmony with the use, scale and architecture of the buildings in the adjacent residential neighborhood. They conserve the nature of the existing neighborhoods and represent a harmonious extension of the Venus Avenue neighborhood. The layout of the buildings in relation to the roadway and the cul-de-sac continue the neighborhood pattern and relates harmoniously to the surrounding environment and to the nearby buildings and residential streets. The project is sufficiently small and well landscaped with existing and added trees so that it has considered the microclimate.

Landscaping and Screening Requirements

The following questions are grouped under this heading: Does the proposed amount of landscaping and screening insure protection of and enhance the quality of the project and the adjacent properties [' 7.1.6(c)] In connection with the proposed site improvements and landscaping, should Appellee-Applicants be required to post a performance bond, letter of credit or other security in an amount sufficient to cover the cost of installation of site improvements and to guarantee landscaping and plant survival, as provided in ' 7.1.10 of the Zoning Ordinance, and, if so, in what amount?

The project as proposed meets this requirement. The proposed landscaping and screening enhances the quality of the project itself. The existing trees, vegetation and fence protects the adjacent properties to the east. The existing fence, three trees over 10" in diameter, and existing trees and brush to be preserved adjacent to Intervenors= and other properties on the north adequately protects the adjacent properties. No bond is required at the present time to guarantee completion of the project and maintenance of the landscaping, because the proposed conditions require Appellee-Applicants to maintain the landscaping for three years after occupancy, and provide for a bond or other surety to be required if, at a later time, occupancy is requested prior to final completion.

Stormwater, Drainage and Hydrology Requirements, and Effect on Natural Areas

The following questions are grouped under this heading: Will the project have an undue adverse effect on rare or irreplaceable natural areas. [' 28-7(a)(1)(G)]. Does the project include development of a portion of a Class II wetlands/natural area? Is precise delineation of the boundary of the wetlands/natural area required? If the project does not include the development of a portion of a Class II wetland/natural area, will it have any negative impact on the wetland area? In particular, will the hydrologic and storm water management plan and subsurface system for storm water drainage adversely affect the wetland/natural area? [' 28-7(a)(1)(G)] Are appropriate measures during construction proposed to avoid impact to the wetlands/natural area and any threatened or rare plant species found on the project site? [' 28-7(a)(1)(G)] Are the project= s hydrologic and storm water management plan and subsurface system for storm water drainage satisfactory. [' 28-7(a)(2)]. Does the project eliminate or significantly impact natural systems and resources, including water, soils, plant and animal life, and scenic areas, contrary to the City= s municipal development plan? [' 28-7(a)(1)(*l*)] ; Does the project eliminates a 1.84-acre natural area of local significance, contrary to the City= s municipal development plan, and is the remaining portion thereof adequately protected [' 28-7(a)(1)(*l*)]

The project as proposed meets these requirements, with an additional condition. As discussed above, the wetlands/natural area and its buffer zone is located entirely on the parcels to be preserved under the management plan. The area of the development parcel is not a natural area of local significance. The wetlands/natural area has been delineated as required, and is not located on and will not be affected by the project on the development parcel, except for the lack of calculation regarding the potential for an adverse effect on the hydrology of the wetlands from the building basements. The stormwater system and road underdrains are adequate to provide drainage for the project and to avoid any additional or adverse drainage onto any adjacent property.

Due to the insufficient design and engineering support in evidence regarding the proposed building basements and associated deep footing drains, in order to meet these criteria, approval is hereby conditioned on Appellee-Applicants= either eliminating the basements from the building design, so that any footing drains below the slabs extend no farther below the surface than do the underdrains proposed for the roadway, or, in lieu of eliminating the building basements, Appellee-Applicants may apply to the City for an amendment to this project, with supporting engineering and hydrology detail, for design and approval of any building basements. Any such amendment application would be an amendment to this project approval, would not be before the Court in the present case, and any appeal from any action by the Zoning Administrator or DRB on such an

amendment application would be a new appeal and not a continuation or reopening of the present appeals.

Accordingly, as discussed above, with the conditions imposed by the DRB and the additional condition imposed in the preceding paragraph, the proposed project satisfies the contested requirements of 1) the A intent@ criteria of ' 11.1.1 of the Zoning Ordinance; 2) the Design Review Criteria of ' 6.1.10 of the Zoning Ordinance; 3)the site plan review criteria of ' 7.1.6 of the Zoning Ordinance; 4) the performance bond provisions of ' 7.1.10 of the Zoning Ordinance; and 5) the Subdivision General Review Criteria of ' 28-7, found in ' 28-7(a) of the Subdivision Ordinance. Based on the foregoing, it is hereby ORDERED and ADJUDGED that the project is approved as designed, with the above conditions, and therefore that Appellee-Applicants= application is GRANTED, with the above conditions.

Done at Barre, Vermont, this 1st day of August, 2003.

_____

Merideth Wright
Environmental Judge

---

### Footnotes

[1.]   This description and sub-parcel sizes are taken from the property plat in evidence; we note that during the hearing the witnesses were not consistent as to their references to the sizes of the various sub-parcels involved in this proposal, but that they all referred consistently to the various sub-parcels as shown on the property plat and on Exhibit 8. Some of the imprecision in these references may have stemmed from the inclusion or exclusion of the land lying under the road rights-of-way, to be deeded to the City; and some may have stemmed from the parties' treatment of the already-developed Franklin Square development as beyond the scope of the present proposal, even though it is shown on the property plat and the cover sheet of Exhibit 8.

[2.]   The parties and witnesses loosely referred to either the 2.3-acre Lot 2 or the area on which the road and buildings are proposed to be constructed as the "proposed PRD." This decision avoids that usage because the proposed PRD includes not only the parcel proposed to contain the residences, but also the preservation of the open land shown on other areas of the overall land owned by BHA.

[3.]   Both the BHA parcel just described and this parcel were loosely referred to in the evidence as southerly parcels and as three-acre parcels; this measurement is taken by scale from the property plat in evidence.

[4.]   The fact that the parcels appear as 'wetland' on the City's Open Space Inventory map only signifies that they are likely to contain areas of wetland. For any development proposal, it is necessary to have a site-specific delineation of the wetlands performed by a consultant to determine the actual boundaries on the ground of the wetland and its required buffer zones.

[5.]   Although Exhibit 14 refers to "calculations to determine the radius of the proposed road underdrain and basement footing drains" the only calculation was performed for the proposed

road underdrain, using the depth of 5 feet (that is, a distance from the bottom of the drain to the impermeable barrier of 3 feet), and not the proposed footing drains with a depth of approximately 8 or more feet.